UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                              :
KEVIN KING, ET AL.,                           :
                          Plaintiffs,         :
                                              :          20 Civ. 4322 (LGS)
            -against-                         :
                                              :
HABIB BANK LIMITED,                           :
                          Defendant.          :
-------------------------------------------------------- X
                                              :
KATHLEEN L. ALEXANDER, ET AL.,                :
                          Plaintiffs,         :
                                              :          21 Civ. 2351 (LGS)
            -against-                         :
                                              :
HABIB BANK LIMITED,                           :
                          Defendant.          :
-------------------------------------------------------- X
                                              :
MARY BORDER, ET AL.,                          :
                          Plaintiffs,         :
                                              :          21 Civ. 6044 (LGS)
            -against-                         :
                                              :          **OPINION AND ORDER**
HABIB BANK LIMITED,                           :
                          Defendant.          :
-------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

        Plaintiffs in these consolidated cases are 370 individuals who were injured or whose

family members were injured or killed in terrorist attacks, who bring this action against

Defendant Habib Bank Limited ("HBL") under the Anti-Terrorism Act ("ATA"), as amended by

the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333.  Defendant moves

to dismiss the Complaints.  For the reasons stated below, the motion is granted in part and denied

in part.

I.     BACKGROUND

The following facts are taken from the Complaints, which are substantially identical. Except as otherwise noted, their allegations are assumed to be true for purposes of this motion. *See R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 509, 512 (2d Cir. 2020).

Plaintiffs were injured or had family members who were injured or killed in terrorist attacks in Afghanistan between 2010 and 2019.  The attacks were planned, authorized and committed by al-Qaeda, sometimes in conjunction with one or more other groups, including: Lashkar-e-Taiba ("LeT"), Jaish-e-Mohammed ("JeM") and its alter ego Al-Rehmat Trust ("ART"), the Afghan Taliban, including the Haqqani Network, and the Pakistani Taliban.  The Complaints label these groups, collectively, the al-Qaeda Terror Syndicate (the "Syndicate"). The U.S. government designated al-Qaeda a Foreign Terrorist Organization ("FTO") in 1999; LeT and JeM in 2001; ART and the Pakistani Taliban in 2010; and the Haqqani Network in 2012 (collectively, the "Syndicate FTOs").  Outside of the Haqqani Network, the Afghan Taliban has not been designated an FTO for purposes of the ATA and JASTA, but was considered a terrorist organization for some purposes by the U.S. government during the period in which the attacks at issue here took place.

Defendant is the largest commercial bank in Pakistan, and it operated a New York branch until at least 2020.  Defendant has provided banking services for decades to notorious terrorists, fronts and fundraisers with direct connections to al-Qaeda, including Osama bin Laden; Jalaluddin Haqqani, founder of the Haqqani Network; Hafiz Muhammad Saeed and Zafar Iqbal, founders of LeT; Al Rashid Trust, an al-Qaeda front; Al-Rehmat Trust, a JeM front; Dawood Ibrahim, founder of the al-Qaeda-linked terrorist and criminal group D-Company; and Pakistan's

Inter-Services Intelligence.  One of Defendant's largest U.S. dollar clearing accounts was held by Al Rajhi Bank ("ARB"), which the U.S. government and the media have linked to funding of al-Qaeda.

Defendant has operated in a regulated sector subject to rigorous due diligence, anti-money laundering ("AML") and "Know-Your-Customer" requirements.  For years, Defendant has flouted regulations designed to stem the flow of funds to terrorists.  Among other abuses, Defendant placed terrorists or those linked to terrorists on a "whitelist" or "good guy list" of people ostensibly pre-cleared for reduced scrutiny of their transactions.  Defendant engaged in tactics, such as "wire-stripping," that shield the identities of parties to transactions.  Defendant's conduct precipitated multiple investigations by the New York Department of Financial Services ("NYDFS").  In 2006, Defendant first committed to clean up its AML procedures, with respect to its correspondent banking services for non-U.S. banks and its U.S. dollar clearing services.  In 2015, Defendant again committed to reform in a consent order, after NYDFS found that Defendant had not abided by the 2006 agreement.  In 2017, NYDFS charged Defendant with several violations -- which Defendant settled for a $255 million fine and loss of its New York banking license -- due to ongoing deficiencies including with Defendant's diligence on ARB, its "whitelist," and its concealment of suspicious transactions.  NYDFS stated that Defendant's banking practices "open the door to the financing of terrorist activities that pose a grave threat to the people of this State and the financial system as a whole."

## II.    STANDARD

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party but does not consider "conclusory allegations or legal conclusions couched as factual allegations."  *Dixon v. von*

*Blanckensee*, 994 F.3d 95, 101 (2d Cir. 2021) (internal quotation marks omitted).  To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678; *accord Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 189 (2d Cir. 2020).  It is not enough for a complaint to allege facts that are consistent with liability; it must "nudge[]" claims "across the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Bensch v. Estate of Umar*, 2 F.4th 70, 80 (2d Cir. 2021).  To survive dismissal, "plaintiffs must provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level."  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 121 (2d Cir. 2019) (alteration in original) (internal quotation marks omitted).

## III.   DISCUSSION

### A.   Personal Jurisdiction

The Complaints sufficiently allege that the Court has personal jurisdiction over Defendant because Plaintiffs' claims arise out of Defendant's purposeful availment of the privilege of doing business in New York.  To the extent Defendant wishes to raise a factual challenge to jurisdiction, Defendant may renew its motion after jurisdictional discovery.

"Before a court may exercise personal jurisdiction over a defendant, three requirements must be met: (1) 'the plaintiff's service of process upon the defendant must have been procedurally proper'; (2) 'there must be a statutory basis for personal jurisdiction that renders such service of process effective'; and (3) 'the exercise of personal jurisdiction must comport

with constitutional due process principles.'" *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 122 (2d Cir. 2021) (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327-28 (2d Cir. 2016) (in turn quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012))).  Defendant does not challenge the procedural propriety of service of process.  Plaintiff alleges personal jurisdiction under the "transacting business" provision of New York's long-arm statute, CPLR § 302(a)(1).  "The CPLR 302(a)(1) jurisdictional inquiry is twofold: under the first prong the defendant must have conducted sufficient activities to have transacted business in the state, and under the second prong, the claims must arise from the transactions."  *Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 7 (N.Y. 2016).  Similarly, "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."  *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

Plaintiffs primarily rely on a theory that "minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  *Schwab*, 22 F.4th at 122 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013)).  "[T]he selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress, constitutes purposeful availment" sufficient to ground personal jurisdiction.  *Licci*, 732 F.3d at 171 (cleaned up).  Since *Licci*, "a series of terrorism-financing cases in the Second Circuit [have] conclude[ed] that jurisdiction lies over banks that executed funds transfers in New York, [including] through their New York branch."  *Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19 Civ. 7, 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020).

The Complaints allege sufficient facts from which to infer that Defendant used its New York branch -- and hence New York's banking system -- "as an instrument to achieve the very wrong alleged," that is, "to further [al-Qaeda's] terrorist goals." *Licci*, 732 F.3d at 171.  The Complaints allege that a large volume of the transactions through Defendant's New York branch were for ARB, a known financier of al-Qaeda, during the period of time that the attacks at issue took place, years after ARB's ties to terrorists became publicly known.  The Complaints allege that Defendant used a "whitelist" and "wire-stripping" to reduce the level of scrutiny on transactions by certain customers, likely including terrorists.  Those practices make it plausible that transactions for terrorists and their funders and fronts were processed through Defendant's New York branch undetected, and that Defendant executed banking transactions in New York in order to aid and abet terrorism -- the very "conduct that could have subjected them to liability under the ATA." *Waldman*, 835 F.3d at 335.

Contrary to Defendant's argument, the Second Circuit's recent opinion in *Daou v. BLC Bank, S.A.L.* is inapposite.  *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 128-133 (2d Cir. 2022). Personal jurisdiction was lacking in *Daou* because the plaintiffs' claims arose out of defendants' *failure* to carry out transactions in New York.  *Id.* at 131.  The Second Circuit held that past and hypothetical future use of a New York account, in transactions unrelated to the actual claims, did not bear the requisite "substantial connection" under New York's long-arm statute.  *Id.* at 131-132.  *Daou* expressly distinguished the facts of *Licci*, which are more analogous to the facts here, in which "accepting the complaint's allegations as true, the defendant's use of its New York account to transfer money provided money for [al-Qaeda] to carry out terrorist violence." *Id.* at 130-131 (cleaned up).

Defendant does not seriously dispute that, if it had repeatedly processed transactions through its New York branch in aid of terrorism, Defendant would be subject to personal jurisdiction.  Instead, Defendant mounts two factual arguments, neither of which is persuasive at this stage of the litigation.  First, Defendant argues that the regulatory reviews that uncovered failures in Defendant's compliance systems did not identify specific terrorist transactions through Defendant's New York branch, only a heightened *risk* of such transactions.  However, the reasonable inference and allegation that terrorist transactions took place repeatedly through Defendant's New York branch rest on the Complaints' significant allegations of Defendant's compliance failures, which render Defendant's New York branch unusually friendly to terrorists.

Second, Defendant filed two affidavits by its executives attesting, among other things, that Defendant did not process terrorists' transactions through New York, that a later version of the report identifying the terrorism risk of Defendant's "whitelist" recanted relevant findings (and should be credited over the original report), and that there are reasonable explanations for apparent instances of "wire-stripping."  Where, as here, the challenge to jurisdiction is made on a motion to dismiss, the factual allegations in the complaint are assumed to be true, and the plaintiff need only plead facts sufficient to make out a prima facie case of jurisdiction. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013); *Schwab*, 22 F.4th at 123-24 (holding that it was error for the district court to resolve a jurisdictional factual dispute in Defendants' favor on a motion to dismiss).  Defendants' declarations are properly considered at a later stage of the proceedings.

Because the Complaints sufficiently allege personal jurisdiction based on Defendant's own purposeful availment of the New York banking system and transacting business in New

York in connection with the claims, there is no need to decide at this time whether the Complaints adequately plead other bases for personal jurisdiction.

### B.      Primary Liability

The claims of primary liability are dismissed because none of the alleged banking services provided by Defendant were themselves acts of international terrorism.  "The ATA affords a civil remedy to persons injured 'by reason of an act of international terrorism.'"  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 325 (2d Cir. 2018) (quoting 18 U.S.C. § 2333(a)).  The ATA's primary liability provision, § 2333(a), predates Congress's enactment in JASTA of a separate secondary-liability provision, and thus § 2333(a) "afford[s] civil relief only against the principals perpetrating acts of international terrorism."  *Id.* at 319; *accord Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 222 (2d Cir. 2019).  To survive a motion to dismiss, a complaint "must allege (1) an injury to a U.S. national, (2) an act of international terrorism," perpetrated by Defendants "and (3) causation."  *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 82 (E.D.N.Y. 2019) (quoting *O'Sullivan v. Deutsche Bank AG*, No. 17 Civ. 8709, 2019 WL 1409446, at *4 (S.D.N.Y. Mar. 28, 2019)); *see* 18 U.S.C. § 2333(a).

International terrorism is defined in part as "activities that . . . involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State," and that appear to have terrorist intent, *i.e.*, intent "to intimidate or coerce a civilian population" or "influence the policy of a government by intimidation or coercion."  18 U.S.C. § 2331(1)(A), (B).

Plaintiff alleges two predicate criminal violations: material support for terrorism under 18 U.S.C. § 2339A and under § 2339B.  Section 2339A criminalizes "provid[ing] material

support . . . knowing or intending that [it is] to be used in preparation for, or in carrying out"
violations of various other criminal statutes, including "kill[ing] a national of the United States,
while such national is outside the United States."  18 U.S.C. §§ 2339A(a), 2332(a).  Section
2339B criminalizes "provid[ing] material support or resources to a foreign terrorist organization"
designated as such "under Section 219 of the Immigration and Nationality Act," knowing that
the organization either "is a designated terrorist organization" or "has engaged or engages in
terrorism."  18 U.S.C. § 2339B(a), (g)(6).

Plaintiffs do not argue that providing material support in the form of money or banking
services is itself a "violent act," but rather that financially supporting a terrorist organization is
nonetheless an "act dangerous to human life."  Plaintiffs rely on *Boim v. Holy Land Found. for
Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008), in which the *en banc* Seventh Circuit reasoned that
providing money to a known terrorist organization, "like giving a loaded gun to a child (which
also is not a violent act), is an 'act dangerous to human life.'"  *Id.* at 690.  The court in *Boim*
found that, while the original ATA did not create secondary liability, Congress "expressly
imposed liability on a class of aiders and abettors" "[t]hrough a chain of incorporations by
reference" involving the material support statutes.  *Id.* at 692.  The court acknowledged that it
was endorsing primary liability that "has the character of secondary liability."  *Id.* at 691.

*Boim*, however, was decided before Congress passed JASTA in 2016 and "explicitly
added a textual basis for secondary liability to the ATA."  *See Kemper v. Deutsche Bank AG*, 911
F.3d 383, 396 (7th Cir. 2018).  Later Second Circuit precedent has recognized that liability of the
kind recognized in *Boim* is now properly lodged under the secondary liability provision of
JASTA.  In *Linde*, the Second Circuit held that "providing financial services to a known terrorist
organization may afford material support to the organization even if the services do not involve

violence or endanger life." 882 F.3d at 326. And in *Honickman v. BLOM Bank SAL*, the Second

Circuit recognized that JASTA had expressly adopted a new "framework for JASTA aiding-and-

abetting liability claims" that replaced the analysis in *Boim*. 6 F.4th 487, 499 n.14 (2d Cir.

2021).

*Linde* and numerous district court cases following it have suggested that primary liability

may still lie where banking services are directed at a specifically identifiable violent or

dangerous act, such as where "bank transfers were explicitly identified as payments for suicide

bombings." *Linde*, 882 F.3d at 321, 327; *see, e.g.*, *Schansman v. Sberbank of Russia PJSC*, 565

F. Supp. 3d 405, 416 (S.D.N.Y. 2021) (finding primary liability sufficiently pleaded where

defendant allegedly "provided financial services to fundraisers and individuals who supported

the DPR" which "provided the funds to the DPR before and after" the group killed hundreds with

a rocket attack on a commercial airliner, which "were used to purchase lethal weapons prior to

the attack"); *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019) (same where

defendant allegedly "received lists for the Insurance Scheme that identified violent causes of

death -- including 'Martyr Operation'" and by providing payments "reward[ed] acts of terrorism"

and "incentivized prospective 'martyrs'").

The cases since *Linde* recognize that liability for banking services provided to support a

terrorist group's mission more generally are properly analyzed under JASTA's aiding-and-

abetting provision. *See Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 529, 532

(S.D.N.Y. 2019), *vacated in part on other grounds*, 999 F.3d 842 (2d Cir. 2021) (holding that

alleged "provision of financial services" to known Hizbollah affiliates "does not, in itself, equate

to international terrorism" despite allegation that Defendant provided banking services "in order,

among other things 'to assist and advance Hizbollah's terrorist activities'"); *Strauss v. Crédit*

*Lyonnais, S.A.*, 379 F. Supp. 3d 148, 159 (E.D.N.Y. 2019) (granting summary judgment where plaintiffs did not offer "evidence that Defendant's banking services *directly* involved strong physical force" or "*directly* involved peril or hazard or were likely to cause serious bodily harm," and "identif[ied] no transfers . . . meant to involve a violent act or an act dangerous to human life") (emphasis added); *cf. Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 161-62 (2d Cir. 2021) (affirming grant of summary judgment to defendants where there was no "evidence that the transfers by NatWest involved violence, or danger to human life" because, for example, they were not "explicitly identified as payments for" violent acts like "suicide bombings").

The Complaints allege that Defendants provided financial services to terrorists and the "purpose of these transactions was to provide illegal support to terrorists engaged in extreme violence." The Complaints do not, however, allege the kind of direct connection to violence or endangerment of human life that would render such financial services "acts of international terrorism" themselves. The primary liability claims are therefore dismissed.

## C. Secondary Liability

Under JASTA's secondary liability provision, "for an injury arising from an act of international terrorism committed, planned, or authorized by" an organization designated as an FTO "as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). "[P]erson" includes both individuals and entities. § 2333(d)(1); 1 U.S.C. § 1. Defendant's motion to dismiss claims of secondary liability is denied because the Complaints sufficiently allege that Defendant aided and abetted al-Qaeda's campaign of terrorism and joined a conspiracy, the object of which included the attacks at issue.

### 1.  Attacks Committed, Planned or Authorized by a Designated FTO

The Complaints sufficiently allege that each of the attacks that injured or killed Plaintiffs or their family members was committed, planned or authorized by al-Qaeda or one of the Syndicate FTOs.  While the Complaints allege several attacks *committed* only by non-FTOs -- specifically, the Taliban and/or the Haqqani network prior to its designation as an FTO -- the Complaints adequately allege that al-Qaeda "planned" or "authorized" each of those attacks.

The Complaints contain more specific allegations of al-Qaeda's involvement in certain attacks than others, but at a minimum the Complaints allege that al-Qaeda and the Taliban -- including the Haqqani Network -- "function[ed] more or less as a single entity" by 2009, prior to the earliest attacks in the Complaints, and were "ideologically and operationally fused" around that time.  The Complaints describe al-Qaeda "us[ing] its extremist allies like elements within the Taliban" as "proxies," acting "not as separate independent operators that occasionally cooperate with one another" but with a high degree of "operational cooperation, training, equipping, [and] financing."  The Complaints allege that al-Qaeda leaders issued a series of statements providing religious authorization specifically urging Muslims in Afghanistan, and the Taliban specifically, to attack U.S. servicemembers, and that the Taliban acknowledged al-Qaeda's authority.  Many attacks committed solely by the Taliban and/or the pre-designation Haqqani Network were committed by suicide bombing, IEDs, RPGs, and kidnapping, and the Complaints allege that al-Qaeda provided training specifically focused on those tactics, among others.  In other cases, the Complaints are even more specific, alleging the specific al-Qaeda operatives who allegedly coordinated attacks or the specific acts of planning al-Qaeda undertook.

Those allegations suffice to plead that each attack in the Complaints was at least planned or authorized by an FTO.  "Congress's stated purpose in enacting JASTA was 'to provide civil

litigants with *the broadest possible basis*, consistent with the Constitution of the United States, to seek relief *against persons [and] entities . . . that have provided material support . . .* to foreign organizations or persons that engage in terrorist activities against the United States,' whether 'directly or indirectly.'" *Kaplan*, 999 F.3d at 856 (quoting JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. at 853) (emphases and alteration in *Kaplan*). The D.C. Circuit recently found sufficient allegations that Hezbollah planned or authorized attacks by the non-FTO Jaysh al-Mahdi, even though the attacks "were committed by Jaysh al-Mahdi with Hezbollah more in the background," because "[i]t is well known that terrorist organizations . . . often operate by proxy." *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 216-17 (D.C. Cir. 2022); *see also Freeman*, 413 F. Supp. 3d at 96-97 (holding that allegations "give rise to the reasonable inference that Hezbollah was responsible" for authorizing attacks where the allegations, "taken as a whole, describe Hezbollah as deeply involved in supporting and coordinating an extensive campaign of terrorist activity against American citizens in Iraq" even "[t]hough Plaintiffs have not named the precise individuals" involved each attack).

In response, Defendant cites cases dealing with individuals who committed terrorist attacks after allegedly being "self-radicalized" by ISIS content on the internet. *Crosby v. Twitter, Inc.*, 921 F.3d 617, 627 (6th Cir. 2019) (Pulse Night Club shooting); *Colon v. Twitter, Inc.*, 14 F.4th 1213, 1222 (11th Cir. 2021) (same); *Gonzalez v. Google LLC*, 2 F.4th 871, 911-12 (9th Cir. 2021) (San Bernardino shooting). In those cases, the complaints did not allege that the individuals who committed the attacks had contact with ISIS prior to the attacks, and ISIS claimed the attacks with approval only after the fact. Those cases are distinguishable from both *Atchley* and the instant Complaints. Contrary to Defendant's argument, the Complaints here do not depend on allegations that the Syndicate is a quasi-FTO that committed the attacks. Rather,

as in *Atchley* and other cases, it is undisputed that many of the attacks were *committed* by a non-FTO, but the Complaints allege sufficiently deep operational coordination between the non-FTO and a separate FTO to satisfy the first statutory element of JASTA secondary liability. *See Atchley*, 22 F.4th at 217-19.

### 2.   Aiding and Abetting Liability

"Congress in enacting JASTA stated that the proper legal framework for assessing JASTA claims is that set out in" *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which "articulated three elements of aiding-and-abetting liability: (1) 'the party whom the defendant aids must perform a wrongful act that causes an injury,' (2) 'the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance,' and (3) 'the defendant must knowingly and substantially assist the principal violation.'" *Kaplan*, 999 F.3d at 856 (quoting *Halberstam*, 704 F.2d at 477).  As discussed above, the "wrongful act" component of the first element is satisfied because each of the Plaintiffs was injured by an act of international terrorism allegedly committed, planned or authorized by al-Qaeda or one of the Syndicate FTOs.  As discussed below, the Complaints also sufficiently allege that Defendant aided those FTOs and that Defendant's aid satisfied the second and third elements of aiding and abetting liability -- Defendant's general awareness of its role as part of an overall campaign of international terrorism, and that Defendant knowingly and substantially assisted those acts.  Consequently, Defendant's motion is denied as to aiding and abetting liability.

### a.   General Awareness

The Complaints sufficiently allege that Defendant was generally aware of its role in terrorism.  "General" awareness is a more permissive standard than full awareness.  The latter

"normally denotes full recognition of the existence or qualities of an object or circumstance,"
while "general awareness" carries "a connotation of something less than full, or fully focused,
recognition" and does not require that the defendant "*knowingly* and *intentionally* supported" the
terrorist organization in perpetrating the attacks. *Kaplan*, 999 F.3d at 863-64 (quoting *Kaplan*,
405 F. Supp. 3d at 536) (emphasis in *Kaplan*, 999 F.3d at 863). The Complaints give rise to a
reasonable inference that Defendant knew its customers were integral to al-Qaeda's overall
campaign of terrorism, carried out directly and by proxy. That is sufficient to allege the general
awareness element under *Halberstam*.

 "A complaint is allowed to contain general allegations as to a defendant's
knowledge . . . because 'a plaintiff realistically cannot be expected to plead a defendant's actual
state of mind.'" *Kaplan*, 999 F.3d at 864 (citation omitted). The Complaints allege that the
relationships between Defendant's customers and al-Qaeda were well known at the time.
Therefore, the Complaints "plausibly allege[] the . . . Customers were so closely intertwined with
[al-Qaeda's] violent terrorist activities that one can reasonably infer that [Defendant] was
generally aware while it was providing banking services to those entities that it was playing a
role in unlawful activities from which [al-Qaeda's] attacks were foreseeable." *Honickman*, 6
F.4th at 499 (first alteration in original, internal quotation marks omitted); *Kaplan*, 999 F.3d at
865 (finding that "allegations as to [the defendant] LCB's knowledge of Hizbollah's terrorist
activities and of the Customers' affiliation with Hizbollah is sufficient to permit the inference
that LCB was at least generally aware that through its money-laundering banking services to the
Customers, LCB was playing a role in Hizbollah's terrorist activities"). The Complaints allege
that Defendant provided extensive banking services to ARB during the period these attacks were
ongoing, despite ARB's allegedly well-documented links to al-Qaeda and other groups. The

Complaints allege that Defendant maintained accounts for the ART and its successors and aliases, at least until shortly before the alleged attacks began, even though ART was allegedly a well-known "al-Qaeda front" that was sanctioned repeatedly.  The Complaints also allege that Defendant maintained bank accounts for the founders of al-Qaeda, the Haqqani Network and LeT, and a front for JeM, despite their being placed on the U.S. government's Specially Designated Nationals and Blocked Persons list or designated as Specially Designated Global Terrorists.  Contrary to Defendant's arguments, the allegations as a whole give rise to a reasonable inference that Defendant provided banking services while generally aware of the role it was playing in the campaign that included the attacks that injured Plaintiffs.

Defendant argues that the Complaints allege only "general banking services," and that, because of the general nature of those services, the Complaints must contain *more* allegations to support an inference of "general awareness" than if the services were more tailored.  As discussed below, the Complaints sufficiently allege that Defendant provided non-"routine" banking services to terrorists and their allies.  In any event, contrary to Defendant's argument, there is no presumption that one who provides "routine" banking services to terrorists is not "generally aware" that they are assuming a role in terrorism.  Defendants rely on *Siegel v. HSBC North America Holdings, Inc.*, in which the complaint alleged only transactions between diversified financial institutions of the kind that are foundational to the international financial system, which ended when the defendant discovered ARB's ties to terrorism.  933 F.3d at 224. *Siegel*'s allegations differ from the Complaints' allegations that Defendant provided banking services -- however routine -- to a web of known terrorists, groups and fronts in addition to ARB, and continued to service ARB long after its ties to terrorists, including al-Qaeda, were known. *Kaplan* rejected any safe harbor for "routine" banking services when it reaffirmed the principle,

from *Halberstam*, that "acts that are 'neutral standing alone . . . must be evaluated in the context of the enterprise they aided.'"  999 F.3d at 866.

*Honickman* and *Linde* are not to the contrary in holding that "more than the provision of material support" under § 2339B is required to give rise to an inference of general awareness. Those cases held that "material support to an FTO, *without more*, does not *as a matter of law* satisfy the general awareness element," because § 2339B requires knowledge that an organization is, in some way, connected to terrorism.  *Honickman*, 6 F.4th at 498 (quoting *Kaplan*, 999 F.3d at 860) (emphasis in *Honickman*).  Those cases do not say "material support to an FTO is *never* sufficient for [JASTA] aiding-and-abetting liability."  *Id.*  Rather, it is a "fact-intensive inquiry" that depends on whether "[terrorist] attacks were *foreseeable*" as a result of Defendant's unlawful activities.  *Id.* (alterations and emphases in original); *see, e.g.*, *Kaplan*, 999 F.3d at 864-65 (finding that the defendant's general awareness was sufficiently pleaded by allegations that Hizbollah, "for several years prior to the [attacks at issue] had openly, publicly, and repeatedly acknowledged" that defendant's customers "were integral constituent parts of" the organization, even though the complaint "provided no precise dates on which the alleged statements were made and did not identify the Hizbollah speakers by name" (cleaned up)); *Brown v. Nat'l Bank of Pakistan*, No. 19 Civ. 11876, 2022 WL 1155905, at *3 (S.D.N.Y. Apr. 19, 2022) (holding that the defendant was "generally aware" that by aiding a particular individual the defendant was assuming a role in terrorism "starting in November 2011, when the Jamestown Foundation published a report, stating that [ART] 'openly carries out fund raising activities using legitimate banking channels' and noting [the individual]'s personal connection to ART").

The only other case cited by Defendant, *Miller v. Arab Bank, PLC*, involved banking services explicitly for the purpose of providing "martyr" payments to incentivize terrorism.  372 F. Supp. 3d at 45.  The court in *Miller* found that providing banking services in those circumstances was so egregious that it constituted a primary act of international terrorism, not only aiding and abetting.  *Id.* at 48.  Similar allegations that services were provided "in an unusual way under unusual circumstances" are likely sufficient but unnecessary to allege aiding and abetting under the "general awareness" standard.  *Id.* (discussing this in the context of the "knowing assistance" element of the *Halberstam* test).

### b.  Knowing and Substantial Assistance

The Complaints sufficiently allege the third element, that Defendant knowingly and substantially assisted al-Qaeda and its proxies evade sanctions and engage terrorist acts.  The requirement that assistance be "knowing" is satisfied if "the defendant knowingly -- and not innocently or inadvertently -- gave assistance."  *Honickman*, 6 F.4th at 499-500 (internal quotation marks omitted).  As discussed above, Defendant knew that by providing banking services to known terrorist affiliates, it was providing assistance, "whether directly to the FTO or indirectly through an intermediary."  *Kaplan*, 999 F.3d at 864.  In *Halberstam*, "[i]t was not necessary that [the defendant] knew specifically that [the principal] was committing burglaries. Rather, when she assisted him, *it was enough that she knew he was involved in some kind of personal property crime at night* . . . because *violence and killing is a foreseeable risk in any of these enterprises*."  *Kaplan*, 999 F.3d at 857 (quoting *Halberstam*, 705 F.2d at 488) (emphases in *Kaplan*).  Put differently, when assistance is provided knowingly, the defendant is not required "to 'know' anything more about [the principal's] unlawful activities than what [it] knew for the general awareness element."  *Honickman*, 6 F.4th at 500; *accord Kaplan*, 999 F.3d at 864.

18

As to the requirement that the assistance be "substantial," *Halberstam* "identified the following six 'factors' that may help . . . : (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Kaplan*, 999 F.3d at 856 (quoting *Linde*, 882 F.3d at 329).  The Complaints plausibly allege that Defendant helped known fronts and financiers for terrorist organizations evade sanctions and contributed to the financing of terrorism.  The *Halberstam* factors support a finding that Defendant's substantial assistance is sufficiently pleaded.

The first factor, the "nature of the act[s] alleged," is relevant because the "nature of the act involved dictates what aid might matter." *Honickman*, 6 F.4th at 500 (quoting *Halberstam*, 705 F.2d at 484).  For example, mere "encouragement" may be important to certain acts of physical violence. *Halberstam*, 705 F.2d at 484.  In this case, many of the alleged acts of terrorism that injured Plaintiffs were committed using IEDs and suicide bombers.  The Complaints sufficiently allege that even relatively small amounts of funding matter a lot and constitute "substantial assistance" in facilitating attacks using those tactics.  The heinousness of the attacks is also relevant because "a court might well reason that culpability for the same amount of assistance would increase with an increase in either the blameworthiness of the tortious act aided or the seriousness of the foreseeable consequences." *Kaplan*, 999 F.3d at 857.

The second factor, the amount of assistance, favors a finding of substantial assistance because the Complaints allege that Defendant's services were important in facilitating access to millions of U.S. dollars, via Defendant's customers, for al-Qaeda and other groups that perpetrated attacks.  The dollar amount of transactions is substantial by any metric.  In weighing the "amount of assistance," "Plaintiffs did not need to allege the funds 'actually went to [al-

Qaeda].' Factual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO would suffice." *Honickman*, 6 F.4th at 500. As discussed above, the Complaints sufficiently allege that the relationships between Defendant's customers and the FTOs that planned, authorized and committed the attacks were well known at the relevant times.

Similarly, the fourth factor, "defendant's relation to the principal," favors a finding of substantial assistance. This factor measures Defendant's "capacity to assist," and "a direct relationship [with] the FTO is not required to satisfy this factor." *Id.* at 500-01. Defendant relies on *Siegel*, in which routine banking services provided by one bank to another (ARB), which may have later made funds available to FTOs through several intermediaries, did not constitute "substantial assistance." 933 F.3d at 225-26. But Defendant's long and deep relationship with ARB is distinguishable from HSBC's relationship in *Siegel*; HSBC ended the relationship after learning of ARB's ties to terrorism, while Defendant here is alleged to have doubled down. In any case, ARB is not the only relevant relationship alleged in the Complaints, and Defendant's alleged direct relationships with multiple fronts and direct funders of terrorism suffice.

The fifth and sixth factors, "defendant's state of mind" and the "period of defendant's assistance," favor a finding of substantial assistance for similar reasons. "[T]he length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided" and also "may afford evidence of the defendant's state of mind." *Kaplan*, 999 F.3d at 857 (quoting *Halberstam*, 705 F.2d at 484). The Complaints allege that Defendant served as banker to terrorists like Jalaluddin Haqqani and Osama bin Laden since the 1990s. Whether or not Defendant's relationships with those individuals had receded by the time of the attacks at issue here,

Defendant allegedly remained committed to facilitating terrorist financing, including of the groups those men founded and their allies and proxies.  The Complaints allege that Defendant's assistance allegedly persisted throughout the period in which the attacks took place, despite the barriers created by international sanctions and the need for groups to use aliases and fronts.

The third *Halberstam* factor is the only one that does not point toward liability.  As a bank, Defendant was not physically present at the time of the attacks alleged.  But that factor does not outweigh the other five.  *Kaplan*, 999 F.3d at 857 ("Plainly these factors are 'variables,' and the absence of some need not be dispositive.") (quoting *Halberstam*, 705 F.2d at 483).

Again, Defendant's argument that "routine" or "common" banking services cannot constitute "substantial assistance" is unpersuasive.  Several of the cases Defendant cites were decided before Congress added aiding-and-abetting liability to the ATA in JASTA, and before it installed *Halberstam* as the governing test for such liability.  Those cases are distinguishable in any event.  *See Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 425 (E.D.N.Y. 2009) (defendant performed only "three wire transfers"); *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 621 (E.D.N.Y. 2006) (defendant engaged in "mere maintenance of a bank account and the receipt or transfer of funds").  *Averbach v. Cairo Amman Bank*, cited by Defendant, is unpersuasive because it relied on since-overruled reasoning in the district court decision in *Kaplan,* requiring direct dealing with a terrorist organization or its proxy.  No. 19 Civ. 4, 2020 WL 486860, at *12 (S.D.N.Y. Jan. 21, 2020) (citing *Kaplan*, 405 F. Supp. 3d at 525).  As discussed above, the Complaints likely would meet this direct-dealing requirement, but in any event are sufficient now that the Second Circuit in *Kaplan* has clarified that "a JASTA claim for aiding and abetting an FTO is available even when the defendant has given assistance only indirectly."  999 F.3d at 866.

Defendant argues that its actions were analogous to those of the defendant in *Siegel*, in which the Second Circuit held that the defendant did not provide knowing and substantial assistance to terrorism by providing banking services to ARB.  933 F.3d at 224.  *Siegel* is distinguishable because the court there found it "crucial[]" that the complaint alleged that HSBC had discontinued its relationship with ARB "ten months before" the attacks in question due to concerns over its relationship to terrorism.  *Id.*  The Complaints here allege, in contrast, that Defendant was repeatedly warned about ARB's ties to terrorism and continued to permit ARB to be one of its biggest U.S. dollar-clearing customers.  In dealing with ARB and numerous other groups and their aliases and fronts, Defendant is alleged to have acted more like the defendant in *Kaplan* who, through "special treatment of the [terrorist-affiliated] Customers allowed them to deposit large sums in various accounts . . . thereby circumventing sanctions imposed in order to hinder terrorist activity."  *Kaplan*, 999 F.3d at 866.  The Complaints allege assistance that was both "qualitatively and quantitatively substantial."  *Id.*

### 3.  Conspiracy Liability

The Complaints sufficiently allege that Defendant joined a conspiracy to commit the attacks at issue for substantially the reasons above.  The Complaints allege that Defendant took deliberate steps to help customers evade international sanctions regimes, and in doing so incurred business risk that ultimately led to Defendant's expulsion from the U.S.  Those allegations are sufficient to make the plausible inference that Defendant had an agreement to further its customers' campaign of terrorism and shared a common purpose to do so.  *See Halberstam*, 705 F.2d at 477 ("Proof of a tacit, as opposed to an explicit, understanding is sufficient to show agreement."); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (noting that "conspiracies are rarely evidenced by explicit agreements" and "nearly always must be proven

22

through inferences that may fairly be drawn from the behavior of the alleged conspirators"
(internal quotation marks omitted)).  The Complaints allege that Defendant shared al-Qaeda's
goal of driving the U.S. military out of Afghanistan, and that allegation is plausible in light of the
many allegations of Defendant's support for al-Qaeda discussed above.

To the extent some district courts suggest that the object of the conspiracy must
contemplate a *specific* act of international terrorism, as opposed to an overall campaign of
terrorism furthered by specific attacks, those decisions are out of step with ordinary conspiracy
principles incorporated into JASTA via *Halberstam*.  705 F.2d at 481 (holding that defendant
"need not even have planned or known about the injurious action, . . . so long as the purpose of
the tortious action was to advance the overall object of the conspiracy").  Defendant cites cases
finding no conspiracy where a bank only helped sanctioned entities -- that were not terrorists and
had "many legitimate interests and functions" -- evade sanctions designed to combat terrorism.
*Freeman*, 413 F. Supp. 3d at 88; *see O'Sullivan*, 2019 WL 1409446, at *9.  Those cases are
inapposite because Defendant's customers were not ostensibly legitimate organizations caught
up in a broad sanctions regime, but allegedly well-known terrorists, fronts and fundraisers.  The
Complaints thus raise a reasonable inference that Defendant "agreed on the essence of the
underlying illegal objectives and the kind of criminal conduct in fact contemplated," and shared
at least "some knowledge of the conspiracy's unlawful aims and objectives."  *Freeman*, 413 F.
Supp. 3d at 87 (internal quotation marks omitted).

Defendant points out that JASTA creates secondary liability for any attack "committed,
planned, or authorized" by an FTO but limits conspiracy liability to defendants who conspired
"with the person who *committed*" the attack.  18 U.S.C. § 2333(d).  Defendant argues that the
Complaints do not allege that it conspired directly with the perpetrators of the attacks, and that

23

"§ 2333(d) does not create liability against a person who . . . conspires with the person who merely authorized (rather than committed) the terrorist act." *Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 650 (E.D.N.Y. 2017).  That argument is unpersuasive because the conspiracy provision of JASTA is most naturally read to require only that the perpetrator of the attack be a member of the same conspiracy as Defendant, and not "that each member of a conspiracy conspire directly with every other member of it." *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989); *accord United States v. Khalupsky*, 5 F.4th 279, 288 (2d Cir. 2021) ("[A] defendant may be a co-conspirator if he knows only one other member of the conspiracy." (cleaned up)).  The Complaints raise a reasonable inference that Defendant joined a conspiracy that included the groups that committed the attacks, including al-Qaeda, the Haqqani Network and the Taliban.  To the extent Defendant urges an alternative inference that there were multiple conspiracies and Defendant was not a member of all of them, that is inappropriate for resolution at the pleading stage.  Defendant's motion to dismiss the conspiracy claims is denied.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Defendant's motion to dismiss for lack of personal jurisdiction is DENIED without prejudice to renewal.  Defendant's motion to dismiss is GRANTED with respect to Plaintiff's primary liability claims and DENIED with respect to secondary liability claims.

By October 19, 2022, the parties shall meet and confer and file a proposed civil case management plan and scheduling order.  The Clerk of Court is respectfully directed to close the motion at Docket Number 47.

Dated: September 28, 2022
     New York, New York

LORNA G. SCHOFIELD
**UNITED STATES DISTRICT JUDGE**