

**BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM**
WASHINGTON, DC 20551

May 4, 2023

By ECF
Hon. Ona T. Wang, United States District Court
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

    Re:    Non-Party Board of Governors of the Federal Reserve System's
              Response to Plaintiffs' April 19, 2023 Letter in
              *King v. Habib Bank Limited,* No. 20-cv-4322-LGS-OTW

Dear Judge Wang:

        Pursuant to Your Honor's April 20, 2023 Order (ECF 118), I write on behalf of non-party Board of Governors of the Federal Reserve System ("Board") to respond to Plaintiffs' April 19, 2023 letter (ECF 115). As described in more detail below, this case turns on whether Defendant Habib Bank Limited ("HBL") knowingly provided substantial assistance to terrorist activity, and the facts necessary to prove Plaintiffs' claims are being produced by HBL and are *not* confidential supervisory information ("CSI"). And while the Board authorized HBL to produce certain CSI in an attempt to satisfy Plaintiffs of this, requiring HBL to produce all remaining CSI in its possession would undermine an important federal privilege and amount to a sideshow into general compliance issues that cannot establish any element of Plaintiffs' claims. Accordingly, the Board respectfully requests that the motion to compel be denied.

**I.**    **Background**

        **A.**    **The JASTA claims that remain at issue**

        Following the Court's opinion on HBL's motion to dismiss, the claims that remain in this case are two secondary liability claims under the Justice Against Sponsors of Terrorism Act ("JASTA"). *See* ECF 58. JASTA established a cause of action against "any person who aids and abets, by knowingly providing substantial assistance" to "an act of international terrorism." 18 U.S.C. § 2333(d)(2). In enacting JASTA, Congress indicated that the "proper legal framework for how [aiding and abetting] liability should function" was identified in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). 18 U.S.C. § 2333 Statutory Note (Findings and Purpose § (a)(5)).

        Under the *Halberstam* framework, Plaintiffs must prove that HBL was "generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provide[d] the assistance," and that HBL "knowingly and substantially assist[ed]" the acts of terrorism.

*Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223 (2d Cir. 2019) (quoting *Halberstam*, 705 F.2d at 477). The bank's "actual awareness is required"; merely proving that the bank "should have been aware of its role" in the terrorist activity does not suffice. *Bernhardt v. Islamic Repub. of Iran*, 47 F.4th 856, 867 n.11 (D.C. Cir. 2022).

### B. The CSI in HBL's possession as to which Plaintiffs seek to compel production

Plaintiffs seek to compel the production of documents from HBL relating to routine supervisory examinations conducted by the Board and the New York Department of Financial Services ("DFS") from 2006 to the present.[1] Specifically, Plaintiffs attached to their letter a list of categories of documents that HBL is withholding and seek to compel production of all categories. ECF 115-1. Those categories taken together cover virtually all CSI in HBL's possession from 2006 to the present.

CSI is defined in pertinent part as "information that is or was created or obtained in furtherance of the Board's supervisory, investigatory, or enforcement activities, … relating to any supervised financial institution[.]" 12 C.F.R. § 261.2(b)(1). CSI is "confidential and privileged." 12 C.F.R. § 261.23(a)(1). Accordingly, "the Board does not normally disclose [CSI] to the public or authorize third parties in possession of [CSI] to further use or disclose the information." *Id.*

However, CSI does not include "[d]ocuments prepared by or for a supervised financial institution for its own business purposes that are in its own possession and that do not include [CSI.]" 12 C.F.R. § 261.2(b)(2)(i). Accordingly, HBL may produce to the Plaintiffs documents in its possession prepared for business purposes, even if copies of those documents also were provided to the Board. HBL's ability to freely produce such documents explains why it has been able to produce various data files and over 160,000 pages of documents without any permission required from the Board. ECF 114, at 6-7.

### C. Plaintiffs' rationale for wanting production of the CSI

Plaintiffs justify their desire to compel production of virtually all CSI in HBL's possession by relying upon publicly issued orders concerning HBL's compliance deficiencies that resulted from supervisory examinations conducted by the Board and DFS. However, in those publicly issued documents, the mentions of terrorism do not appear until 2017, and even then, they are not a primary focus. Specifically, an August 2017 notice of hearing summarized a wide range of compliance issues that were concerning to DFS.[2] One of these compliance issues was that HBL had a relationship with a correspondent bank with terrorism links, and HBL failed to establish an appropriate "control environment to manage" that relationship. *Id.* at ¶¶ 11-16.

---

[1] Plaintiffs frequently refer to "investigations" by the Board, which is an incorrect characterization. ECF 115, at 1. The Board conducted supervisory examinations, which determine compliance with various federal banking laws and are conducted periodically for any bank under the Board's authority. *See, e.g.*, *Examination Manual for U.S. Branches and Agencies of Foreign Banking Organizations* (www.federalreserve.gov/boarddocs/supmanual/us_branches/usbranch.pdf).

[2] www.dfs.ny.gov/system/files/documents/2020/03/ea170824_habib_notice.pdf

Another issue was that HBL had excluded many transactions from among those that might be subjected to additional scrutiny, and some of these transactions may have involved two customers with possible links to terrorism. *Id.* at ¶ 19. These two issues, along with many others unrelated to terrorism, were then repeated in a September 2017 order.[3]

Thus, the public documents from the Board and DFS were focused on identifying general compliance weaknesses in many areas, not on opining as to whether HBL knowingly assisted terrorist activity.

### D. The Board's and DFS's authorizations in response to Plaintiffs' demands

In an attempt to accommodate Plaintiffs and avoid the current motion to compel, beginning in February, the Board and DFS authorized HBL to produce three categories of CSI:

- All final reports of supervisory examinations from 2006 to the present.
- All final reports generated by third-party entities (such as auditors) from 2006 to the present as a result of any order issued by regulators.
- Internal HBL documents relating to any document in the foregoing two categories.

## II. Argument

### A. The CSI that Plaintiffs seek is not relevant

Plaintiffs have never explained to the Board or DFS, nor articulated to the Court, how documents from supervisory examinations will help Plaintiffs demonstrate that HBL was "generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provide[d] the assistance," and that HBL "knowingly and substantially assist[ed]" the acts of terrorism. *Siegel*, 933 F.3d at 223 (quoting *Halberstam*, 705 F.2d at 477). Indeed, the 2017 notice of hearing upon which Plaintiffs have relied to make their sweeping demands for all CSI dating back to 2006 does not say that HBL knowingly assisted terrorism: it merely states that there was heightened risk associated with a correspondent bank used by HBL, and that HBL improperly excluded many transactions (including some involving two individuals with possible terrorist links) from the universe of transactions that might be subjected to additional scrutiny. Thus, the 2017 notice flagged that HBL had compliance issues such that HBL was not properly monitoring certain transactions posing higher risks, not that HBL was knowing and substantially assisting acts of terrorism.

Courts have repeatedly emphasized that general compliance failures cannot establish a JASTA violation. For example, this Court held that merely establishing that a bank "adopt[ed] slipshod banking practices," "operat[ed] with inadequate anti-money laundering controls," and had "connections generally with terrorist organizations" was insufficient to establish a JASTA violation. *Siegel v. HSBC Bank USA, N.A.*, 2018 WL 3611967, at *4 (S.D.N.Y. July 27, 2018), *aff'd* 933 F.3d 217 (2d Cir. 2019). Similarly, a sister court held that a bank's "lax regulatory environment which facilitated money laundering" and "ultimately allow[ed] money to flow to FTOs [foreign terrorist organizations]" was insufficient to establish "general awareness" or "substantial assistance" under JASTA. *Wildman v. Deutsche Bank Aktiengesellschaft*, 2022 WL

---

[3] https://www.dfs.ny.gov/system/files/documents/2020/03/ea170907_habib.pdf, at ¶¶ 12-19, 22.

17993076, at *15 (E.D.N.Y. Dec. 29, 2022); *see also O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *8 (S.D.N.Y. Mar. 28, 2019) (allegation that defendants "provided financial services to various [entities] with connections to terrorist organizations" insufficient). Thus, the examination documents that Plaintiffs seek here will not establish information relevant to adjudication of this case.

Indeed, as Plaintiffs have noted, "[d]iscovery relating to the individual members and supporters of the [terrorism] Syndicate is at the heart of this case." ECF 101, at 1; *see also Bartlett v. Societe Generale de Banque au Liban SAL*, 2023 WL 2734641, at *15 (E.D.N.Y. Mar. 31, 2023) ("Given the need for internal bank documents and records, … Defendants are really the only source for the vast bulk of the needed discovery."). HBL has produced, or is in the process of producing, documents relating to individuals with possible terrorist connections whose names have been supplied by Plaintiffs. *See* ECF 114, at 6-8; ECF 119. In contrast, records from third parties "are not likely to provide much information about each Defendants' knowledge of its customers or Defendants' general awareness of their customers' activities." *Bartlett*, 2023 WL 2734641, at *15.

Even if documents from supervisory examinations were relevant, the Board and DFS authorized HBL to produce the final examination reports from 2006 to the present, final reports from third-party auditors that HBL hired as a result of orders from regulators, and HBL internal documents discussing the foregoing. To the extent that there is any salient point that Plaintiffs desire to make concerning HBL's compliance issues, those points are best made through final versions of documents which contain final determinations and analyses, and Plaintiffs are receiving those documents.[4]

### B. Even if the CSI were somehow relevant, it is privileged

Even if CSI concerning general compliance issues had some tangential relevance to the adjudication of a dispute concerning whether HBL knew that it was playing a role in terrorism, the documents are nonetheless protected from disclosure by the bank examination privilege. That privilege "accords agency opinions and recommendations and banks' responses thereto protection from disclosure." *In re Citigroup Bond Litig.*, 2011 WL 8210671, at *1 (S.D.N.Y. Dec. 5, 2011) (quotation omitted).

Specifically, during the course of supervisory examinations, supervised financial institutions such as HBL engage in communications with the Federal Reserve where the success of the process "depends vitally upon the quality of communication[.]" *In re Subpoena Served*

---

[4] *Wultz v. Bank of China Ltd.*, 61 F. Supp. 3d 272 (S.D.N.Y. 2013), does not aid Plaintiffs' cause. *Wultz* was a pre-JASTA case under the Anti-Terrorism Act, and the court held that the supervisory documents "may show whether [the bank] had notice of criticisms of its [compliance] practices[.]" *Id.* at 289. As described above, however, a bank's knowledge of general compliance issues is irrelevant for a JASTA claim. *See, e.g.*, *Bernhardt*, 47 F.4th at 870 (noting the stringent proof required for aiding-and-abetting liability under JASTA). In addition, the *Wultz* court held that "bank examination reports" would establish "whether [the bank] had notice of criticisms" (61 F. Supp. 3d at 287-89), and the Board has authorized production of those reports.

*Upon Comptroller of Currency*, 967 F.2d 630, 633 (D.C. Cir. 1992). As one appeals court described:

> Bank management must be open and forthcoming in response to the inquiries of bank examiners, and the examiners must in turn be frank in expressing their concerns about the bank. These conditions simply could not be met as well if communications between the bank and its regulators were not privileged.

*Id.* at 634.

To the extent there is any segregable factual information in the privileged documents, if that factual information raised any compliance issues, it would have been presented in the final supervisory documents that HBL has been authorized to produce. In addition, that factual information would have been drawn *from HBL's records*, as that is the source upon which the Federal Reserve relied in conducting the examinations of HBL. Plaintiffs are obtaining significant productions of business records and other information from HBL, and thus Plaintiffs have the full opportunity to obtain the same factual information that bank regulators were able to obtain.

Accordingly, there is no basis for overriding the federal bank examination privilege in this case.

### III.   Conclusion

For the foregoing reasons, the Board respectfully requests that Plaintiffs' motion to compel production of CSI from HBL be denied.

Respectfully submitted,

 /s/ *Yvonne F. Mizusawa*
Yvonne F. Mizusawa, Senior Counsel (YM5081)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 469-1007
yvonne.f.mizusawa@frb.gov

*Counsel for Board of Governors of the Federal Reserve System*

**CERTIFICATION OF WORD COUNT**

      Pursuant to the Magistrate Judge's Order dated April 20, 2023 (ECF 118), I hereby certify that the foregoing letter brief contains 1996 words, excluding the salutation, signature block, and this certificate. Microsoft Word for Office 365 was used to calculate the word count.

      /s/ *Yvonne F. Mizusawa*
Yvonne F. Mizusawa, Senior Counsel (YM5081)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 469-1007
yvonne.f.mizusawa@frb.gov

*Counsel for Board of Governors of the Federal Reserve System*